**IN THE COURT OF APPEALS OF IOWA**

No. 14-1077
Filed September 17, 2014

**IN THE INTEREST OF J.S.,**
**Minor Child,**

**J.G., Father,**
 Appellant.

_____

 Appeal from the Iowa District Court for Linn County, Barbara H. Liesveld,

District Associate Judge.

 A father appeals from the order terminating his parental rights.

**AFFIRMED.**

 Robin Miller, Marion, for appellant father.

 Thomas J. Miller, Attorney General, Janet L. Hoffman, Assistant Attorney

General, Jerry Vander Sanden, County Attorney, and Kelly Kaufman, Assistant

County Attorney, for appellee State.

 Kimberly Opatz of Linn County Advocate, Cedar Rapids, for minor child.

 Considered by Danilson, C.J., and Vogel and Bower, JJ.

**DANILSON, C.J.**

A father appeals from the order terminating his parental rights. After the father's brief relationship with the child's mother, the father was aware of the mother's pregnancy and the child's birth. Notwithstanding, nearly two years passed before he accepted his responsibilities. After more than eight months of services, he is still not ready to parent the child. Because grounds for termination exist, an extension of time would not likely change the result, and termination is in the child's best interests, we affirm.

## I. Background Facts.

J.S. was born in May 2011. In August 2010, the mother, B.S., and the father, J.G., were residing with J.G.'s girlfriend (B.S.'s sister), and J.G.'s mother. B.S. and J.G. had sex, though J.G. remained involved with her sister. B.S. had other sexual partners during this time frame and apparently told J.G. she was already pregnant. During the eight months after the child was born, J.G. saw the child about four times.

B.S. moved from the residence and, in December 2011, J.S. was removed from her care and custody while she was residing with her alcoholic father and a person under investigation for sexual abuse. B.S. identified two men as putative fathers of the child—neither was J.G. J.S. was adjudicated a child in need of assistance (CINA) on January 10, 2012. After several months of juvenile court involvement, the two putative fathers underwent paternity testing, and neither was found to be the child's father. The child remained in foster care.

In March 2013—the child now almost two years old—B.S. identified J.G. as a putative father, and he became involved in the CINA proceedings. In May, B.S. consented to the termination of her parental rights.

J.G.'s paternity of J.S. was established in July 2013. J.G. began receiving supervised visits with the child and participating in parenting classes. In a July 22, 2013 statement to the court, the guardian ad litem (GAL) expressed concern for a delay in permanency for the child as the child remained in foster care and was bonded with the foster family (his half-sister was also placed there). The GAL noted, however, that J.G. was participating in and had shown a willingness to cooperate with services. She recommended J.G. be granted a limited amount of time to demonstrate his ability to care for the child.

In a July 23, 2013 permanency review and amended permanency order, the permanency goal in the CINA proceeding was modified to reunification with the father. J.G. was ordered to obtain a psychological/psychiatric evaluation and follow any resulting recommendations.

Following a July 27, 2013 family team meeting and based on the father's reports he had a history of marijuana use[1] and possession-of-drug-paraphernalia charges, it was agreed that J.G. would undergo a substance abuse evaluation, follow any recommendations, and participate in ongoing drug testing. The August 23, 2013 case plan noted J.G. has a "history of behavioral problems as a child and he appears to have had difficulty adjusting to adult life. [He] resides with his mother and is not currently employed."[2] The case plan also reported

---

[1] He reported his most recent use was in April.

[2] J.G. was then twenty-nine years old.

J.G. had a domestic violence history (with B.S.'s sister) and agreed to participate in all services recommended by mental health and substance abuse evaluations.

On November 25, 2013, the GAL submitted a statement to the court in which she states:

> [J.G.] has been consistent with his participation in visits with [the child], and they are developing a bond. [J.G.] has never parented a child, and there are concerns regarding [J.G.]'s parenting. He is not always receptive to suggestions offered by the [Family Safety, Risk, and Permanency] FSRP provider. [J.G.] participates in [Young Parents Network] YPN and receives parenting through their program, but he appears to struggle with applying those skills with [the child]. [J.G.] is able to meet [the child]'s physical needs, but is unclear if he has the skills to work with [the child] on his developmental or emotional skills.
>
> It is also not clear at this time if [J.G.] is able to meet his own needs. [J.G.] resides with his mother, and he is not employed. He appears to be dependent on his mother for his daily living. [J.G.] does not have income to support [the child] independent of his mother.
>
> [J.G.] completed his psychological testing through Horizons at the end of September. During his psychological testing, the evaluator noted concerns about [J.G.] and his relationship with his mother. [J.G.]'s testing also recommended he participate in individual counseling. [J.G.] has refused to comply with this recommendation, and he indicates that he will not participate in counseling. [J.G.] also scored in the high risk range for abuse with regard to restricting power and independence in children.
>
> [J.G.] had progressed in his visitation with [the child], but this was recently restricted due to [J.G.] not following the visit guidelines. [J.G.] has been told repeatedly that [B.S.]'s sister . . . is not allowed to be present during [J.G.]'s visits with [the child]. [J.G.] and [his girlfriend] have an unstable relationship, and they have a lot of conflict in their relationship. [J.G.'s girlfriend] has sought out no contact orders on [J.G.] in the past. Due to these concerns, [she] has not been approved to be present at visits. The Department received reports that [J.G.'s girlfriend] was present during semi-supervised visits, and this was addressed with [J.G.]. He indicated that she was not present. During a visit on November 22nd, the provider observed [her] at [J.G.]'s home, and the visit was ended.
>
> I am recommending that a termination of parental rights petition be filed to achieve permanency for [the child]. [The child] has been out of parental care for two years, and he has spent

almost his entire life in his current foster home. He has not had long-term, significant contact with either of his biological parents. [The child] is very bonded with his foster parents and his sister who also resides in the home. It would be in [the child]'s best interest to remain in the [foster] home as they have consistently cared for him and met all of his needs for the majority of his life.

The juvenile court's November 27, 2013 permanency review order noted the father was living with B.S.'s sister, who was pregnant with J.G.'s child and who was not authorized to be around J.S. The court also noted J.S. was in need of structure and struggled with any changes to his routine. The court ordered J.G. to participate in individual counseling.

A petition to terminate J.G.'s rights was filed on January 15, 2014.

The GAL's January 30, 2014 statement to the court reported J.G. was resistant to services, did not understand the child's "needs or development," continued to be involved with his girlfriend, and was not addressing these concerns through individual or couple's counseling. The court entered a review order on January 31 noting J.G. and his girlfriend were living together "despite a volatile history." The court continued its prior orders.

A permanency and termination hearing was held on March 28, 2014. J.G. was currently having two supervised, and one semi-supervised visit per week. He testified he was attending parenting meetings at Young Parents Network. He testified he worked with services providers on parenting (though acknowledged he informed them he no longer wanted to work on parenting with them). He stated he followed their recommendations "[h]alf the time" because he did not always agree with their advice. He gave as an example his disagreement with

the recommendations of certain foods for the child.[3] He did state he was making different food choices after visiting with the child's doctor.

J.G. acknowledged that police had been called due to an incident between him and his girlfriend in October 2013. He testified that they recently had begun couple's counseling.[4] J.G. testified he had completed a mental health evaluation and he had been diagnosed with anxiety. Though individual counseling was recommended, he refused to go to counseling "at first." He stated he had begun individual therapy with the same counselor as was providing couple's counseling—with his girlfriend in the room. He testified was not willing to see a counselor by himself.

J.G. testified he and his girlfriend continued to live with his mother in a two-bedroom apartment. He stated it was not big enough for them and the baby expected in June, but they were all looking for a three- or four-bedroom house. J.G. asked that the court grant an extension until May to allow reunification. He acknowledged J.S. would need a period of introduction before coming to live with him: "I think [it would be better to] introduce him instead of right off the bat. All of the sudden change like that could be little too much for him at his age, since we haven't got to that–close to that point yet."

Mallory Alm of Tanager Place provided safety checks and supervised visits for J.S. Alm testified she had observed visits between J.G. and child and

---

[3] The child had been diagnosed obese and was in need of a restricted calorie diet. J.G. did not agree the child was obese and resisted dietary restrictions until after he visited with the child's doctor on March 7, 2014.

[4] The counselor testified the two had attended six sessions (one hour twice a week) beginning in late February 2014. They were "talking a lot about this trial and coping with worries about losing his son."

"there's a lot of parallel play," "they're in the same room, but they're doing separate activities and there's not much interaction." She described the bond between father and child as one of "friendship." "They play and then . . . [J.S.] plays and they have lunch and then he goes. I mean, he's okay leaving. Wouldn't really say there's a very strong bond or parental bond." Alm testified she could not recommend that the child be placed with J.G. at present.

Iowa Department of Human Services social worker Brian Jeffery testified he had been assigned to J.S.'s case since spring 2012. Jeffery testified he recommended termination because the child was in need of permanency and J.G. had made "very limited" progress in terms of his parenting education, recommended therapy, and his relationship with his girlfriend. Jeffery testified the child was strongly bonded to his foster parents, who had adopted his half-sister and had expressed willingness to adopt J.S. as well. On cross-examination, Jeffery testified it was possible that visits between father and child could progress through semi-supervised to unsupervised visits in four to six months, but it was not likely. Jeffrey explained that the J.G.'s resistance to services[5] would be compounded with the arrival of a newborn.

J.G.'s girlfriend testified she had lived with J.G. and his mother consistently since November and there had been no problems requiring the police. She testified things were better since she was pregnant because she was no longer on birth control, which caused mood swings. She testified she was

---

[5] For instance, when a service provider makes a parenting suggestion, J.G. will make statement that "he knows how to parent and he's going to do it another way or he doesn't think this is a good idea." And when Jeffrey discussed the child's dietary needs with him, J.G. questioned the doctor's understanding of the child's needs and qualifications.

disabled (i.e., she was "slow at things"), received social security disability income, had a payee, and worked with MHDD services. She felt couple's counseling was helping her.

J.G.'s mother also testified. She testified J.G. lived with her because they "have a special bond and I do have health problems." She stated J.G. was resistant to suggestions from Tanager service providers because "[h]e had Tanager in the home most of his life and had some bad reactions to the counseling back then." She testified J.G. as a child was "diagnosed ADD, with hyperactivity, with a learning disability in reception and also had oppositional behavior. And he was in special ed all of his life." She stated she, too, had a learning disability. She stated that J.G.'s girlfriend helped with the rent and the three of them were looking for a larger residence.

The juvenile court terminated the father's parental rights pursuant to Iowa Code section 232.116(1)(h). The father appeals.

**II. Standard of Review.**

We conduct a de novo review of termination of parental rights proceedings. *In re H.S.*, 805 N.W.2d 737, 745 (Iowa 2013). Although we are not bound by the juvenile court's findings of fact, we do give them weight, especially in assessing the credibility of witnesses. *In re D.W.*, 791 N.W.2d 703, 706 (Iowa 2010). An order terminating parental rights will be upheld if there is clear and convincing evidence of grounds for termination under section 232.116. *Id.* Evidence is considered "clear and convincing" when there are no "serious or substantial doubts as to the correctness [of] conclusions of law drawn from the evidence." *Id.*

### III. Discussion.

Iowa Code chapter 232 termination of parental rights follows a three-step analysis. *In re P.L.*, 778 N.W.2d 33, 39 (Iowa 2010). The court must determine whether a ground for termination under section 232.116(1) is established. *Id.* If a ground is established, the court must determine if termination is in the child's best interests. *Id.* If the statutory best-interest framework supports termination of parental rights, *see* Iowa Code § 232.116(2), the court must finally consider if any statutory exceptions or factors set out in section 232.116(3) weigh against termination of parental rights. *P.L.*, 778 N.W.2d at 39.

J.G. contends there is not clear and convincing evidence to support termination. We disagree. Under Iowa Code section 232.116(1)(h), the court may terminate the rights of a parent to a child if: (1) the child is three years old or younger, (2) the child has been adjudicated a CINA under section 232.96, (3) the child has been out of the parent's custody for at least six of the last twelve months or the last six consecutive months, and (4) "[t]here is clear and convincing evidence that the child cannot be returned to the custody of the child's parents as provided in section 232.102 at the present time." The father challenges only the last element, but his own testimony establishes that the child cannot be placed in his care at present: "we haven't got . . . close to that point yet." Moreover, the apartment the father lived in was not large enough for the three adults and the expected baby, let alone another child.

"Even after we have determined that statutory grounds for termination exist, we must still determine whether termination is in the children's best interests." *In re A.B.*, 815 N.W.2d 764, 776 (Iowa 2012); *accord* Iowa Code

§ 232.116(2). We "give primary consideration to the child's safety, to the best placement for furthering the long-term nurturing and growth of the child, and to the physical, mental, and emotional condition and needs of the child." Iowa Code § 232.116(2); *accord In re P.L.*, 778 N.W.2d at 40. The father requests additional time to remedy his deficiencies, contending the time would not be an undue hardship on the child. The statutory framework provides otherwise.

"[O]ur legislature has carefully constructed a time frame to provide a balance between the parent's efforts and the child's long-term best interests." *D.W.*, 791 N.W.2d at 707. "Ultimately, the issue is not parental culpability but whether the statutory requirements have been met." *In re A.M.*, 843 N.W.2d 100, 111 n.9 (Iowa 2014).

The statutory framework for a child under the age of three authorizes termination when the child has been out of the parent's custody for six consecutive months. This child has been in foster care for more than two years. We are cognizant that the father did not know of his paternity until July 2013. But for two years he chose to ignore the possibility of his fatherhood as he knew of the mother's pregnancy and the child's birth. *See In re M.M.S.*, 502 N.W.2d 4, 7 (Iowa 1993) (stating the father "must be charged with some sense of involvement on the basis of his encounter with [the mother] and his knowledge of her pregnancy that followed, even notwithstanding rumors of another father"). Although J.G. chose to believe that J.S. was not his child, he was then afforded more than eight months to work toward reunification. He was less than cooperative with the case plan until just before termination was scheduled. Such eleventh-hour efforts do not bode well for the possibility of reunification in a

reasonable amount of time. *In re C.B.*, 611 N.W.2d 489, 495 (Iowa 2000) ("Insight for the determination of the child's long-range best interests can be gleaned from 'evidence of the parent's past performance for that performance may be indicative of the quality of the future care that parent is capable of providing.'" (citation omitted)).

"It is well-settled law that we cannot deprive a child of permanency after the State has proved a ground for termination under section 232.116(1) by hoping someday a parent will learn to be a parent and be able to provide a stable home for the child." *P.L.*, 778 N.W.2d at 41. Termination will enable the child to achieve permanency. *See A.M.*, 843 N.W.2d at 113 (citing *In re J.E.*, 723 N.W.2d 793, 802 (Iowa 2006) (Cady, J., concurring specially) (noting the "defining elements in a child's best interest" are the child's safety and the child's "need for a permanent home")).

The father does not suggest any section 232.116(3) factor precludes termination.

We therefore affirm termination of the father's parental rights.

**AFFIRMED.**